BROTHERHOOD OF MAINTENANCE OF WAY
EMPLOYES ET AL. *v.* UNITED STATES ET AL.

No. 681. Argued March 28, 1961.—Decided May 1, 1961.

*William G. Mahoney* argued the cause for appellants. With him on the brief were *Clarence M. Mulholland, Edward J. Hickey, Jr., James L. Highsaw, Jr., George E. Brand* and *George E. Brand, Jr.*

*Solicitor General Cox* argued the cause for appellees. With him on the brief were *Assistant Attorney General Loevinger, Ralph S. Spritzer, Richard A. Solomon* and *Robert W. Ginnane.*

*Ralph L. McAfee* argued the cause for the Erie-Lackawanna Railroad Co., appellee. With him on the brief were *John H. Pickering, Richard D. Rohr* and *Thomas D. Caine.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The dispute in this case commenced when the Delaware, Lackawanna & Western Railroad Co. and the Erie

Railroad Co. filed a joint application for approval by the Interstate Commerce Commission of a proposed merger, the surviving company to be known as the Erie-Lackawanna Railroad Co. Supervision by the Commission of railroad mergers is required by § 5 (2) of the Interstate Commerce Act, 54 Stat. 905, 49 U. S. C. § 5 (2), and the statute directs the Commission to authorize such transactions as it finds will be "consistent with the public interest." The Commission concluded in this case that the public interest would be served by a merger of the two applicants and that finding has not been questioned. The point in issue is whether the conditions attached to the merger for the protection of the employees of the two roads satisfy the congressional mandate embodied in § 5 (2)(f) of the Act, which provides in relevant part that:

> "As a condition of its approval, under this paragraph (2), of any transaction involving a carrier or carriers by railroad subject to the provisions of this part, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. *In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment,* except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order." (Emphasis added.)

Before the Commission's hearing examiner, the railroads suggested that the "New Orleans conditions" be imposed in satisfaction of § 5 (2)(f). These conditions derive their name and substance from the Commission's decision in the *New Orleans Union Passenger Terminal Case*, 282 I. C. C. 271, and they provide compensation benefits for employees displaced or discharged as a result of a merger.[1] After the hearing had concluded, however, appellant Railway Labor Executives' Association (RLEA) filed a brief with the examiner claiming that compensatory conditions were not enough since, in its view, the second sentence of § 5 (2)(f) imposes a minimum requirement that no employee be discharged for at least the length of his prior service up to four years following consummation of the merger. The hearing examiner did not agree with the RLEA's reading of § 5 (2)(f) and recommended the New Orleans conditions to the Commission, a recommendation which the Commission unanimously adopted. 312 I. C. C. 185. Appellants then instituted proceedings in the United States District Court of Michigan, seeking to enjoin the Commission's order approving the merger. A temporary restraining order issued following testimony by a representative of the RLEA that irreparable injury to the employees would otherwise ensue. However, after hearing the case on its merits, the District Court dissolved the restraining order and dismissed appellants' complaint. 189 F. Supp.

---

[1] Briefly, the New Orleans conditions prescribe the following: employees retained on the job but in a lower paying position get the difference between the two salaries for four years following the merger; discharged employees get their old salaries for four years, less whatever they make in other jobs, or they may elect a lump sum payment; transferred employees get certain moving expenses, and certain fringe benefits are insured; and any additional benefits that a given employee would have received under the Washington Job Protection Agreement, discussed in the text *infra*, are guaranteed.

942. Direct appeal to this Court followed and we noted probable jurisdiction. 365 U. S. 809.

Preliminarily, it must be noted that the adequacy of the New Orleans conditions is not an issue before this Court: Appellants did not challenge their sufficiency below, nor do they argue the point here.[2] Rather, appellants' sole contention is that no compensation plan is adequate unless it is based on the premise that all the employees currently on the payroll remain in the surviving railroad's employ for at least the length of their previous employment up to four years. Appellants do not say that every employee must remain in his present job, but they do insist that some job must remain open for each one. We think, however, that a review of the background of § 5 (2)(f) and its subsequent interpretation demonstrates the defects in appellants' position.

Section 5 (2)(f), as it now appears, was enacted as part of the Transportation Act of 1940. A broad synopsis of the occurrences which led to the enactment of those sections on railroad consolidation of which § 5 (2)(f) is a part is contained in the Appendix to this Court's opinion in *St. Joe Paper Co.* v. *Atlantic Coast Line R. Co.*, 347 U. S. 298, 315, and it is unnecessary to reproduce that

---

[2] Appellants do relate certain objections to the adequacy of the conditions but it seems clear that these objections, which were not introduced before the Commission or the court below except at the hearing for temporary injunctive relief, have been included in appellants' brief only as background material. If appellants wish to challenge directly the adequacy of the conditions, it seems clear that they may still proceed to do so pursuant to § 5 (9) of the Act.

In this connection, it should be noted that appellants have contended that the lower court erred when it refused to accept certain testimony concerning the adequacy of the conditions. The short answer to this is that the court did not refuse to accept appellants' proof; the court explicitly refrained from ruling on the matter when the offer was made and appellants never renewed their efforts. See R. 179.

material here except to note that: "The congressional purpose in the sweeping revision of § 5 of the Interstate Commerce Act in 1940, enacting § 5 (2)(a) in its present form, was to facilitate merger and consolidation in the national transportation system." *County of Marin* v. *United States,* 356 U. S. 412, 416. The relevant events, for present purposes, date from 1933, when Congress passed the Emergency Railroad Transportation Act, 48 Stat. 211. That Act contemplated extensive railroad consolidations and provided for employee protection pursuant thereto in the following language:

> "[N]or shall any employee in such service be deprived of employment such as he had during said month of May or be in a worse position with respect to his compensation for such employment, by reason of any action taken pursuant to the authority conferred by this title."

Shortly before the Emergency Act expired in 1936, a great majority of the Nation's railroads and brotherhoods entered into the Washington Job Protection Agreement,[3] an industry-wide collective bargaining agreement which also specified conditions for the protection of employees in the event of mergers. Unlike the Emergency Act, however, the Washington Agreement provided for compensatory protection rather than the "job freeze" previously prescribed. Subsequently, efforts commenced to re-evaluate the law relating to railroad consolidations and a "Committee of Six" was appointed by the President to study the matter. Those portions of the Committee's final report pertaining to employee protection urged codification of the Washington Agreement[4] and a bill drafted

---

[3] A discussion of this agreement and its terms is found in *United States* v. *Lowden,* 308 U. S. 225.

[4] See Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 2531 and H. R. 4862, 76th Cong., 1st Sess. 216–217, 275.

along those lines, S. 2009, was passed by the Senate in 1939. 84 Cong. Rec. 6158. The Senate bill contained language identical to that now found in the first sentence of § 5 (2)(f)—*i. e.*, the transaction should contain "fair and equitable" conditions.

A bill similar in this respect to S. 2009 was introduced in the House but, before it was sent to the Conference Committee, Representative Harrington inserted an amendment which added a second sentence to the one contained in the original version, this sentence stating that:

"[N]o such transaction shall be approved by the Commission if such transaction will result in unemployment or displacement of employees of the carrier or carriers, or in the impairment of existing employment rights of said employees." 84 Cong. Rec. 9882.

The bill came out of the Conference Committee without Representative Harrington's addendum and, dissatisfaction having been expressed by Representative Harrington and others, a motion to recommit was passed by the House. This motion required that the language of the original House bill be restored "but modified so that the sentence in section 8 which contains the provision known as the Harrington amendment" should speak as the second sentence of § 5 (2)(f) now does—*viz.*, "[the] transaction will not result in employees of said carrier . . . being in a worse position with regard to their employment." 86 Cong. Rec. 5886. This new phraseology was adopted by the Conference Committee, with the added limitation that such protection need extend no more than four years, and the bill passed without further relevant alteration. 86 Cong. Rec. 10193, 11766.

It would not be productive to relate in detail the various statements offered by members of the House to explain the significance of the events outlined above. It is enough to say that they were many, sometimes ambig-

uous and often conflicting. However, certain points can be made with confidence. First, it is clear that there were two alterations made in the substance of the original Harrington amendment: Not only was a four-year limitation imposed, but also general language of imprecise import was used in substitution for language clearly requiring "job freeze" such as appeared in the original amendment and the 1933 Act.[5] Secondly, the representatives whose floor statements are entitled to the greatest weight are those House members who had the last word on the bill—the House conferees who explained the final version of the statute to the House at large immediately prior to passage—rather than those Congressmen whose voices were heard in the early skirmishing but who did not participate in the final compromise.[6] Finally, although

---

[5] As further evidence that Congress would have specified "job freeze" had it meant "job freeze" in the 1940 Act, compare the 1943 amendment to § 222 (f) of the Communications Act, 47 U. S. C. § 222 (f), where an employee protective arrangement was added by the following language:

"Each employee of any carrier which is a party to a consolidation or merger pursuant to this section who was employed by such carrier immediately preceding the approval of such consolidation or merger, and whose period of employment began on or before March 1, 1941, shall be employed by the carrier resulting from such consolidation or merger for a period of not less than four years from the date of the approval of such consolidation or merger, and during such period no such employee shall, without his consent, have his compensation reduced or be assigned to work which is inconsistent with his past training and experience in the telegraph industry." See also the remarks of Senator White, a proponent of this bill, at 89 Cong. Rec. 1195–1196.

[6] Appellants point out that several members of the conference committee opposed the motion to recommit. However, as appellants must concede, reliance on unexplained opposition to a proposal is untrustworthy at best. Witness the fact that all the House members on whose remarks appellants base their position (Representatives Warren, Harrington, and Thomas) voted *against* the final version of the bill.

it might be an overstatement to claim that their remarks are dispositive, the statements the House conferees gave in explanation of the final version clearly reveal an understanding that compensation, not "job freeze," was contemplated.[7] Appellants vigorously argue that the legislative history of § 5 (2) (f) supports their interpretation. However, were we to agree, it would be necessary to say that a substantial change in phraseology was made for no purpose and to disregard the statements of those

---

[7] See the remarks of conference chairman Lea at 86 Cong. Rec. 10178, particularly that part of his explanation responding to questions put by Representatives Vorys and O'Connor, where it was said:

"Mr. VORYS of Ohio. Mr. Speaker, will the gentleman yield?

"Mr. LEA. I yield to the gentleman from Ohio.

"Mr. VORYS of Ohio. Would this 4-year rule have the effect of delaying a consolidation for 4 years, or would it mean that if a consolidation were made there would still be a 4-year period during which the man would be paid?

"Mr. LEA. No; this rule does not delay consolidation. It means from the effective date of the order of the Commission the benefits are available for 4 years. The order determines the date, and the protective benefits run 4 years from that date.

"Mr. VORYS of Ohio. That would be whether or not they were still employed?

"Mr. LEA. Yes.

"Mr. O'CONNOR. Mr. Speaker, will the gentleman yield?

"Mr. LEA. I yield to the gentleman from Montana.

"Mr. O'CONNOR. As I want to see those who might lose their jobs as a result of consolidation protected, I should like to have the gentleman's interpretation of the phrase that the employee will not be placed in a worse position with respect to his employment. Does 'worse position' as used mean that his compensation will be just the same for a period of 4 years, assuming that he were employed for 4 years, as it would if no consolidation were effected?

"Mr. LEA. I take that to be the correct interpretation of those words."

See also the statements of conference member Halleck at 86 Cong. Rec. 10187, and conference member Wolverton at 86 Cong. Rec. 10189. The Conference Report also lends itself to this interpretation. H. R. Rep. No. 2832, 76th Cong., 3d Sess., pp. 68–69.

House members most intimately connected with the final version of the statute.

The indications gleaned from the history of the statute are reinforced and confirmed by subsequent events. Immediately after the section was passed, interested parties—including the brotherhood appealing in this case—expressed the opinion that compensation protection for discharged employees was the intendment of § 5 (2)(f).[8] The Commission echoed this interpretation in its next annual report, I. C. C. 55th Ann. Rep. 60–61, and began imposing compensatory conditions, and only compensatory conditions, in proceedings involving § 5 transactions. See, *e. g., Cleveland & Pittsburgh R. Co. Purchase,* 244 I. C. C. 793 (1941). The Commission has consistently followed this practice to date in over 80 cases, with the full support of the intervening brotherhoods and the RLEA;[9] indeed, in one case where a

---

[8] In its official organ, appellant Brotherhood of Maintenance of Way Employes stated:

*"Four Years' Full Pay*

"2. The law provides that any employe who has been in the service of a railroad four years or more, and loses his job because of a merger or 'coordination', must be paid his full wages for four years. If he has been a railroad employe less than four years, he must be paid his full wages for a period as long as his previous service.

"No such protection and compensation have ever been guaranteed by law to the employes of any other industry, and the railroad workers secured these unprecedented benefits through the Brotherhood of Maintenance of Way Employes, in a cooperative movement with the other Standard Railroad Labor Organizations." 49 Journal 13–14 (Oct. 1940).

See also 57 The Railway Conductor 308 (Oct. 1940); 39 Railway Clerk 467, 488. It is clear that the District Court did not err in taking cognizance of these publications, particularly since appellants raised no objections below. Cf. *Texas & Pacific R. Co.* v. *Pottorff,* 291 U. S. 245, 254.

[9] A comprehensive list of the decided cases, with a description of the conditions imposed, is found in the Appendix to the Brief of

variant of the present dispute arose, the RLEA argued at length that § 5 (2)(f) did *not* impose a mandatory job freeze requirement—compensatory conditions would be satisfactory.[10] It is true that many of these prior transactions did not involve consolidations of the magnitude here presented. However, the relevance of this point is unclear since the statute makes no distinctions based on the type of transaction considered, and it is apparent that the underlying principle remains the same whether 100 or 1,000 employees are affected.[11]

Appellants' last point is that two cases in this Court have previously treated the present question favorably to their position. *Railway Labor Executives' Assn.* v. *United States,* 339 U. S. 142, and *Order of Railroad Telegraphers* v. *Chicago & North Western R. Co.,* 362 U. S. 330. However, neither the holding nor the language of these cases, in fact, supports appellants' claim. The *RLEA* case was not concerned with the types of protection to be afforded employees for the first four years following the merger; the only question was whether

the United States in this case. It is noteworthy that this Court has recently affirmed a case in which the Commission imposed less comprehensive conditions than those in this case. *City of Nashville* v. *United States,* 355 U. S. 63.

[10] See Memorandum Brief of RLEA, Finance Docket No. 12460, filed in *Fort Worth & D. C. R. Co. Lease,* 247 I. C. C. 119.

[11] According to the findings of the hearing examiner in this case, 863 employees will be totally deprived of employment during the five-year period following the merger. Appellants argue that there is no need for these discharges since natural attrition will open up many more than 863 jobs during the same period. However, as the railroads point out, attrition does not work in a uniform or predictable manner and there is no indication that the elimination of surplus posts can be accomplished by the method appellants suggest; moreover, if attrition does open up suitable positions, the railroad is bound by the collective bargaining agreement to call back the discharged employees.

compensatory benefits could be extended beyond four years, and the Court held they could. Appellants point to passages in the opinion, 339 U. S., at 151–154, in which, they assert, the Court recognized that only *one* change— the four-year limitation—was blended into the Harrington amendment between origination and final approval. However, this contention ignores the plain recognition of the Court, revealed on page 152 of the opinion, that two changes occurred, one of which being the alteration in language pertinent to the resolution of this case. The *Railroad Telegraphers* case is equally inapposite. The question in that case concerned the power of a federal court to enjoin a strike over the railroad's refusal to bargain concerning a "job freeze" proposal in the collective bargaining contract, and there is no discussion of the present problem in the opinion of the Court.

In short, we are unwilling to overturn a long-standing administrative interpretation of a statute, acquiesced in by all interested parties for 20 years, when all the signposts of congressional intent, to the extent they are ascertainable, indicate that the administrative interpretation is correct. Consequently, the judgment of the District Court must be

*Affirmed.*

Mr. Justice Douglas, dissenting.

This case is a minor episode in an important chapter of modern history. It concerns the impact of economic and technological changes on workers [1] and the manner in

---

[1] "In California, the Bank of America installed electronic computers in its mortgage-and-loan operation, and 100 employees are now doing the work of 300. In Cleveland, an electronically controlled concrete plant can in one hour produce 200 cubic yards of concrete in any of 1,500 mixing formulas, without a single worker performing manual labor at any point in the process.

"In a bakery in Chicago, one man operates a piece of equipment

which government will deal with it. The courts do not determine that policy; it is a legislative matter. But the judicial attitude has much to do with the manner in which legislative ambiguities will be resolved.

There are some who think that technological change will produce both our highest industrial and business activity and our greatest unemployment. Dr. Robert M. Hutchins recently stated the basic conflict between individual freedom and technology:

"Individual freedom is associated with doubt, hesitancy, perplexity, trial and error. These technology

that moves 20 tons of flour an hour, replacing 24 men who used to move 10 tons an hour. In the bread-baking department of this same plant, one half of the workers were supplanted by automation, and in the wrapping department, no less than 70 per cent of the workers formerly needed have been replaced by machines.

"In the textile industry, entire plants have moved out of New England towns to set up new automated factories in the South, using a comparative handful of workers and leaving great hardship and suffering behind. In the automobile industry, new electronically controlled assembly lines helped to cut total employment by 20 per cent between 1956 and 1958, and over 200,000 workers dropped out of the United Automobile Workers from mid-1957 to early 1959.

"In the shipping industry, huge containers are now packed and sealed at factories and loaded directly aboard special new compartmented ships, eliminating the need for thousands of longshoremen. In the transportation-equipment industry, production rose, but employment fell by a quarter of a million workers between January, 1956, and December, 1958. In the rubber industry, there was a drop of 25,000 workers. In the chemical industry, 36,000 workers were displaced by automation." Davidson, Our Biggest Strike Peril: Fear of Automation, Look Magazine, April 25, 1961, pp. 69, 75.

See also the remarks of Walter P. Reuther, President, United Automobile Workers of America, as quoted in Christian Science Monitor, Thursday, Apr. 27, 1961, p. 4, col. 2: "When a worker is replaced by a machine, or his skill is made obsolete, or his plant moves, the change may benefit society as a whole and his employer in particular; but that worker is in trouble."

cannot countenance. Liberty under law presupposes the supremacy of politics. It presupposes the possibility, for example, that political deliberation might lead to the decision to postpone the introduction of a new machine. Technology, on the other hand, asserts that what we can do is worth doing; the things most worth doing are those we can do most efficiently . . . ." Two Faces of Federalism (1961), p. 22.

The measure of the conflict is seen only in a broad frame of reference. As Dr. Hutchins said:

"Technology holds out the hope that men can actually achieve at last goals toward which they have been struggling since the dawn of history: freedom from want, disease, and drudgery, and the consequent opportunity to lead human lives. But a rich, healthy, workless world peopled by bio-mechanical links is an inhuman world. The prospects of humanity turn upon its ability to find the law that will direct technology to human uses." Two Faces of Federalism (1961), p. 24.

The Secretary of Labor, Arthur J. Goldberg, recently put the problem in simple terms: [2]

"The issue being joined in our economy today— one that is present in some form in every major industrial negotiation—is simply stated: how can the necessity for continued increases in productivity,

---

[2] Goldberg, Challenge of "Industrial Revolution II," N. Y. Times Magazine, Apr. 2, 1961, p. 11. And see A. H. Raskin's recent series in the New York Times. N. Y. Times, Thursday, Apr. 6, 1961, p. 1, cols. 2–3; N. Y. Times, Friday, Apr. 7, 1961, p. 1, cols. 2–3; N. Y. Times, Saturday, Apr. 8, 1961, p. 1, cols. 2–3; N. Y. Times, Sunday, Apr. 9, 1961, p. 1, cols. 2–3.

based upon labor-saving techniques, be met without causing individual hardship and widespread unemployment?"

This case is a phase of that problem.

This is not the first instance of a controversy settled in Congress by adoption of ambiguous language and then transferred to the courts, each side claiming a victory in the legislative halls.[3]

The Senate passed a bill which required the Interstate Commerce Commission in approving a railroad merger to make "a fair and equitable arrangement to protect the interest of the employees affected."[4] The House Committee adopted the same language.[5] When the bill reached the floor of the House, Mr. Harrington suggested the following *proviso:*[6]

> "*Provided, however,* That no such transaction shall be approved by the Commission if such transaction will result in unemployment or displacement of employees of the carrier or carriers, or in the impairment of existing employment rights of said employees."

That amendment would have prohibited permanently the displacement of employees as a result of mergers. It was adopted by the House.[7] But in Conference that *proviso* was eliminated along with the merger provisions that gave rise to it.[8] The House recommitted the bill with instructions that the provisions relating to combinations and consolidations of carriers be included in the bill, and be amended to provide that the Commission

[3] See Newman and Surrey, Legislation (1955), pp. 158–178.

[4] S. Rep. No. 433, 76th Cong., 1st Sess., p. 29.

[5] H. R. Rep. No. 1217, 76th Cong., 1st Sess., p. 12.

[6] 84 Cong. Rec., pt. 9, 76th Cong., 1st Sess., pp. 9882–9883.

[7] 84 Cong. Rec. 9887.

[8] H. R. Rep. No. 2016, 76th Cong., 3d Sess., p. 61.

must include in its orders authorizing mergers "terms and conditions providing that such transaction will not result in employees of said . . . carriers being in a worse position with respect to their employment." [9]

The Conference accepted this version, limiting the protective clause to four years. The Conference Report emphasizes that the change made in the Harrington proposal was in limiting its operation to four years. [10]

---

[9] 86 Cong. Rec., pt. 6, 76th Cong., 3d Sess., p. 5886.

[10] "The conference agreement on the Harrington amendment includes a provision of the instruction which provides that the order of approval shall include terms and conditions providing that the transaction shall not result in the employees being in a worse position with respect to their employment. The conference agreement, however, qualifies this provision by confining its operation to a period of 4 years from the effective date of the order approving the transaction and providing further that the protection afforded to an employee shall not be required to continue for a longer period following the effective date of the order than the period for which such employee was in the employ of an affected carrier prior to the effective date of the order.

"In order words, the Harrington amendment made all employees of the affected carriers equal beneficiaries of its provisions regardless of the length of time they may have been employed prior to a consolidation. It also required the carrier to maintain the benefits of its provisions indefinitely and without any specified limitation by time or otherwise. Under the terms of the conference agreement the benefits to employees will be required to be paid for not longer than 4 years after the consolidation, and in no case for longer than the service of the employee for the affected carriers prior to the effective date of the order authorizing the consolidation." H. R. Rep. No. 2832, 76th Cong., 3d Sess., p. 69.

The Court refers to the "unexplained opposition" of Mr. Harrington to the final version of the bill. But the record offers a plausible explanation for his opposition. Mr. Harrington himself apparently had decided that the proposed amendment was objectionable because it failed to cover abandonments. 86 Cong. Rec., pt. 9, 76th Cong., 3d Sess., p. 10187. And see the remarks of Mr. Crosser, 86 Cong. Rec., pt. 9, 76th Cong., 3d Sess., p. 10192.

184

Mr. Lea, Chairman of the House Conferees, stated the same in the House: [11]

"The substitute that we bring in here provides two additional things. First, there is a limitation on the operation of the Harrington amendment for 4 years from the effective date of the order of the Commission approving the consolidation. In other words, *the employees have the protection against unemployment for 4 years,* but the Commission is not required to give them benefits for any longer period. If the employees themselves make an agreement with the railroad company for a better or a longer period, that is a matter between the railroad men and the railroads, but this 4-year limitation is established by the pending conference agreement.

"There is another limitation on the protective benefits afforded by the amendment. The benefit period shall not be required for a longer period than the prior employment of the employee before the consolidation occurred. In other words, under the original Harrington amendment, *if a man was employed for 6 months,* he would indefinitely be subject to the benefits of the amendment from the railroad company. We have changed that so the railroad company will not be required to maintain him in no worse condition as to his employment for any longer period than he worked before the consolidation occurred.

"We believe that is a very fair and a very liberal provision for labor. We believe that railway labor substantially agrees in that viewpoint. We take nothing from labor by this agreement." (Italics added.)

---

[11] 86 Cong. Rec., pt. 9, p. 10178.

Mr. Wolverton, another House Conferee, stated: [12]

"It was recognized that the real intent of the sponsors was to save railroad *employees from being suddenly thrust out of employment* as the result of any consolidation or merger entered into." (Italics added.)

These are the statements [13] which, the Court says, "are entitled to the greatest weight" in interpreting the *proviso*. I do not think that these statements—nor any part of this legislative history—"clearly reveal an understanding that compensation, not 'job freeze,' was contemplated." Instead I find this legislative history—as the Court elsewhere seems to recognize—to be, at best, ambiguous. Compensatory relief will result in the employees' bearing the initial shock of the railroads' reduction in plant. The Commission and the railroads contend for a philosophy of firing first and picking up the social pieces later. The Court seizes on ambiguous materials to impute to Congress approval of that philosophy. I would resolve the ambiguity in favor of the employees. I would read the *proviso* as meaning that nothing less than four-year employment protection to every employee

---

[12] *Id.*, p. 10189.

[13] The third House Conferee on whose remarks the Court seems to rely is Congressman Halleck. But he merely says that the *proviso* "follows the principle of the so-called Washington agreement." What that principle was he makes clear in his next sentence: "This language gives to the employees greater protection and more far-reaching protection and recognizes the principle to which we all subscribe, that rights of employees should be protected, and, beyond that, writes it into law." *Id.*, p. 10187. The Court also relies on Congressman Lea's acquiescence in the assertions—more or less equivocal—of Congressmen Vorys and O'Connor. But, even assuming those assertions negative a guarantee of continuing employment, Congressman Lea's acquiescence hardly jibes fully with his more extended remarks on the same subject which I have quoted above.

would satisfy the Act, though not necessarily a four-year protection in his old job.   In a realistic sense a man without a job is "in a worse position with respect to" his "employment," though he receives some compensation for doing nothing.   Many men, at least, are not drones; and their continued activity is life itself.   The toll which economic and technological changes will make on employees is so great that they, rather than the capital which they have created,[14] should be the beneficiaries of any doubts that overhang these legislative controversies when they are shifted to the courts.

---

[14] Lincoln in his annual message to Congress, Dec. 3, 1861, stated: "Labor is prior to, and independent of, capital.   Capital is only the fruit of labor, and could never have existed if labor had not first existed.   Labor is the superior of capital, and deserves much the higher consideration."   V Basler, The Collected Works of Abraham Lincoln (1953), p. 52.