**Russell H. DUNCAN, Petitioner,**

v.

**RAILROAD RETIREMENT BOARD,**
**Respondent.**

**No. 10676.**

United States Court of Appeals
Fourth Circuit.

Argued Dec. 8, 1966.

Decided March 30, 1967.

---

Lawrence L. Koontz, Jr., Roanoke, Va. (B. Purnell Eggleston and Eggleston, Holton, Butler & Glenn, Roanoke, Va., on brief), for petitioner.

Myles F. Gibbons, Gen. Counsel, Railroad Retirement Board, Chicago, Ill., (David B. Schreiber, Associate Gen. Counsel, Edward E. Reilly and David M. Goldman, Railroad Retirement Board, Chicago, Ill., on brief), for respondent.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

SOBELOFF, Circuit Judge:

The Railroad Retirement Board denied Russell H. Duncan's application for a total disability annuity under 45 U.S.C.A. § 228b(a) (5) (1954) on the ground that, while the medical testimony established that he was disabled from returning to his former occupation, he was not physically or mentally disqualified from engaging in "any regular employment." [1] Duncan contends that the Board did not fulfill its duty under the statute by merely determining that he was not medically incapacitated from pursuing other gainful employment. His position is that once it was established to the Board's satisfaction that he was disabled from returning to his former occupation,[2] it became the Board's duty to make the additional determination whether there was a reasonable opportunity for persons with his residual capacities to secure employment of the type postulated by the Board. The appeal thus raises the threshold question whether the Board applied the proper legal standard in determining total disability.

In essence, Duncan argues that the standard required by section 228b(a) (5) is substantially similar to that prevailing under the Social Security Act to determine a claimant's right to disability benefits.[3] The issue is sharply delineated by the Board's frank concession that under that Act the administrator is required "to ascertain what employment opportunities there are for the particular

1. Subject to exceptions not pertinent here, the statutory standard qualifies for total disability annuities "[i]ndividuals whose permanent physical or mental condition is such that they are unable to engage in any regular employment."

2. Only one of the physicians who examined Duncan was of the opinion that he could continue working as a boilermaker, his regular occupation. Five other doctors found varying degrees of incapacity, ranging from the opinion of Duncan's personal physician that he was totally disabled for any gainful employment to that of the Board's medical consultant who, although he did not examine Duncan, concluded that, on the basis of the medical evidence submitted to the Board, he could engage in some type of indoor work, such as a clerk, ticket agent, cashier, hotel manager or elevator operator.

While the Board did not specifically find Duncan unable to return to his former occupation, this is the clear implication of its findings and conclusions. Thus, the Board stated that

While appellant's formal education may have ended with the eleventh grade, it is more than sufficient not only to perform a wide range of work for which no special experience or skills are necessary, but also to lead to many kinds of clerical work and to some types of managerial positions. At his age and with medical conditions of no greater severity than he is shown to have, he could do various kinds of indoor work, including that of cashier, ticket agent, [or] other similar occupations.

3. A recent discussion of the Social Security Act standards, under decisions of this and other circuits, is contained in Gardner v. Earnest, 371 F.2d 606 (4th Cir. 1967).

claimant, in his general area, with his residual capacity, age, education, etc.," while the standard the Board avowedly employs "does not take into account actual employment opportunities for a person with the claimant's residual capacities * * *."

While the basis of the Board's holding is not entirely clear, as will be discussed, we agree with the appellant that the decision must be set aside.

## I

Duncan's application, filed in June, 1964, was denied by the Bureau of Retirement Claims, the initial adjudicating body. The Bureau's adverse decision was sustained by the agency Appeals Council. On appeal to the Board, and after review of the applicant's background, prior work experience, and the medical evaluations submitted by six physicians, it was concluded that Duncan's disabilities, taken either singly or in combination, did not render him unfit from a purely physical or mental standpoint to engage in some regular employment other than his former occupation.[4] Considering his age and education, the Board suggested that he had the requisite physical and mental capacity to work at a variety of indoor occupations for which no special skill or experience was necessary, listing as possibilities employment as a cashier, ticket agent, or "similar occupations."

The question remains, however, whether standing alone mere physical capacity to perform the duties of these alternative callings is sufficient to warrant denial of Duncan's application. No reason suggests itself for adopting a different standard under the Railroad Retirement Act from that which the decisions have elaborated under the Social Security Act, which requires but a common-sense evaluation of a claimant's actual employability. While the language of the two statutes is not identical, both are aimed at the common underlying problem of providing for persons who, while not without some remaining physical capacity to undertake gainful employment, are nevertheless without practical employment opportunities by reason of their impairments. It would be illogical to predicate a different result on the Retirement Act's phraseology of "any regular employment," as contrasted with the Social Security Act's "any substantial gainful activity."[5] The Board's own regulations

4. The administrative record discloses that at the date of his application in June, 1964, Duncan was 37 years old, married and had two minor children. He began working after finishing the 11th grade in the Southern States Co-op Mill as a laborer, where he remained for seven months. In 1944, he was hired by the Norfolk & Western Railroad, working first as a laborer in the storehouse department and then as an apprentice and journeyman boilermaker. There he remained until 1958, when he obtained a position as a boilermaker with the United States Naval Shipyards at Charleston, South Carolina, and, later, at Portsmouth, Virginia. He stopped working in May, 1964 because of his disabilities and was awarded an annuity by the Civil Service Commission, which found him totally disabled for work as a boilermaker by reason of Raynaud's disease, Diabetes Mellitus, hypertensive cardio-vascular disease and suggestive degenerative vascular changes in the lower legs.

The undisputed medical evidence presented to the Board is that Duncan suffers from Raynaud's disease and Diabetes Mellitus. One or more of six examining physicians also identified the following impairments: varicose veins, uncomplicated essential hypertension, hypertensive cardio-vascular disease, suggestive degenerative vascular changes in the lower legs, anxiety state, asthma, occasional arthritis, and arthralgia of the right hand.

Raynaud's disease, Duncan's most serious affliction, involves impairment of sensitivity in the extremities, accompanied by a tingling and burning sensation upon exposure to colder weather, in Duncan's case, temperatures below 60° F. When circulation resumes in warmer atmospheres, the fingers and toes turn pink and red and burn as they warn up. Taber's Cyclopedic Medical Dictionary (9th ed. 1963).

5. The term disability, as a qualification for the receipt of benefits under the Social Security Act, is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment * * *." 42 U.S.C.A. § 416(i) (1) (1965).

paraphrase the disability criterion in terms resembling the Social Security Act:

An individual is permanently disabled from engaging in any regular employment whenever his physical or mental condition is such that he is unable to perform regularly, in the usual and customary manner the substantial and material duties of any regular and gainful employment which is substantial and not trifling * * *. 20 C.F.R. § 208.17 (1966).

The Board, in its brief and oral argument on appeal, also advances no linguistic or policy reason dictating rejection of employability in fact as an important consideration in determining eligibility for a total disability annuity. It mounts an argument for a restrictive interpretation of section 228b(a) (5) upon the basis of that section's legislative history.

Initially, the railroad retirement legislation provided an occupational disability annuity only, and formulated as the test of eligibility whether "the carrier has retired the employee because of physical or mental inability to continue in active service." 48 Stat. 1285(1934). This provision was deleted by the Railroad Retirement Act of 1937 and a total disability annuity was substituted, requiring that the claimant be "totally and permanently disabled for regular employment for hire." 50 Stat. 309(1937). Dissatisfaction with this more stringent standard motivated Congress in 1946 to amend the Act again by restoring the occupational disability annuity introduced in 1934 in supplement of the total disability annuity legislated in 1937. At the same time, Congress revised the language in which the total disability test was couched to read as it does today.

The House Report submitted in conjunction with the 1946 amendments indicates that this revision in language was intended solely to conform the phrasing of the total disability provision to that of the added occupational disability annuity and was not intended to alter the standard of eligibility for a total disability annuity.[6] The Board has marshalled extensive quotations and references to the 1946 congressional debate in an attempt to show what Congress at that time understood as the eligibility standard. The substance of these sources is reflected in a supplemental report of the Senate Committee on Interstate Commerce, explaining the change which the addition of an occupational disability annuity would work in retirement benefits.

This paragraph introduces the occupational disability feature. Under present law the only disability that is recognized is total and permanent disability to do any kind of work. If he [claimant] is not so disabled, if he is only disabled for work in his regular occupation, he is considered able to work in some other occupation regardless of whether his training, age, and background are such as to hold out any reasonable prospect that he could get other work. S.Rep. No. 1710, Part 2, 79th Cong., 2d Sess. 12 (1946).

The Board contends that this passage in the report constitutes approval of a strict interpretation of eligibility for total disability benefits.

Our view is rather that construing section 228b(a) (5) to incorporate employability in fact as a material element in determining eligibility for such benefits is not at all inconsistent with this legislative history. It does not follow that by restoring the occupational disability annuity in 1946 instead of amending the total disability provision, Congress intended to approve the then existing administrative interpretation of section 228b(a) (5). The draftsmen may well have been thinking in terms of the presence of the occupational disability feature introduced in 1934 and

6. Compare the language of the occupational disability provision reintroduced in 1946, "whose permanent physical or mental condition is such as to be disabling for work in their regular occupation," 60 Stat. 727, 45 U.S.C.A. § 228b(a) (4) (1946), with the language of the amended total disability provision quoted in footnote 1, supra. See H.Rep.No.1989, 79th Cong., 2d Sess. 11 (1946).

may merely have been seeking to give effect to their solicitude for those who had been disadvantaged by its deletion in 1937. So viewed, the congressional purpose harmonizes with the notion that employability in fact should be considered in the administration of social welfare legislation. The germinal circuit court opinion is Judge Friendly's in a Social Security case, Kerner v. Flemming, 283 F.2d 916 (2d Cir. 1960).[7] While the Board cites a number of circuits as approving administrative decisions based solely on a physical disability standard,[8] only one of these cases was decided after *Kerner*,[9] and neither that case nor any other that we have found presents a reasoned judicial rejection of the position here urged by Duncan.

■ The Board seeks to fortify its position upon the theory of congressional acceptance of its restrictive standards since 1946. True, long-standing administrative interpretation of a statute, acquiesced in by all interested parties, may form the basis for an inference that the administrative interpretation is correct. However, courts are properly chary of equating mere inaction with approval, in the absence of a solid foundation for the inference of conscious ratification. The case cited to us by the Board, Brotherhood of Maintenance of Way Employees v. United States, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206, (1961), which displays the factual underpinnings missing in the instant case, weakens, rather than reinforces, the Board's position. There the question was whether revision of a pending bill was meant to attenuate the protections afforded railroad employees adversely affected by carrier mergers. As the Court noted, "all the signposts of congressional intent, to the extent that they are ascertainable, indicate that the administrative interpretation is correct." 366 U.S. at 179, 81 S.Ct. at 918. In that case, language guaranteeing the protections urged by railroad employees was first specifically incorporated and then deleted from the ultimate bill, and words of a more general import substituted. The Court refused to consider that what it regarded as "a substantial change in phraseology was made for no purpose * * *." 366 U.S. at 176, 81 S.Ct. at 917. There is no comparable legislative history here. The 1946 amendment to section 228b(a) (5) was, as indicated above, only technical. Congressional attention was focused on the desirability of reintroducing the occupational disability annuity, and it is unreasonable, without more, to infer from the failure of Congress substantively to revise that section, congressional approval of the Board's interpretation.

Finally, the Board calls attention to the unique position which railroad employees occupied in the drafting and

---

7. In *Kerner*, Judge Friendly, discussing the requisite factual underpinnings of a determination that a claimant is able to perform substantial gainful activity, stated:

> [s]uch a determination requires resolution of two issues—what can applicant do, and what employment opportunities are there for a man who can do only what applicant can do? Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available * * *. 283 F.2d at 921 (citation omitted).

8. *E. g.*, Aldridge v. Railroad Retirement Board, 285 F.2d 759 (5th Cir. 1961); Ogle v. Railroad Retirement Board, 238 F.2d 233 (6th Cir. 1956); Schafer v. Railroad Retirement Board, 217 F.2d 874 (7th Cir. 1954); Marr v. Railroad Retirement Board, 206 F.2d 47 (4th Cir. 1953); Rob- inson v. Railroad Retirement Board, 184 F.2d 703 (8th Cir. 1950). None of these cases, however, squarely faced and rejected the argument advanced by Duncan, the court being concerned in each primarily with the substantiality of the medical evidence to support the Board's decision.

9. Copeland v. Railroad Retirement Board, 327 F.2d 348 (5th Cir. 1964). While Duncan urges that *Copeland* really held, contrary to the Board's assertion, that the standards of the Social Security Act are the same as those of the Railroad Retirement Act, a close examination of that decision indicates that the court had reference only to the similarity in the scope of review provided by the two Acts, both according conclusiveness to agency findings supported by substantial evidence. 327 F. 2d at 350.

continue to occupy in the implementation of railroad retirement legislation.[10] Apparently, the argument is that Congress, recognizing that both employee and industry representatives are continuously engaged in elaborating the statutory framework, adopted a hands-off policy permitting the legislation to develop free from legislative or judicial intervention. However, while Congress may have fostered joint participation of employees and employers in the formulation and administration of such legislation, this is no reason to assume that it meant to exclude the courts from their accustomed role as intrepreters of statutory language.

In sum, while the Board has culled legislative history to buttress its position, it has failed to provide a firm basis for concluding that Congress intended by the 1946 amendments to approve the Board's restrictive interpretation. Particularly in view of the realistic standard prevailing in the analogous Social Security field, which harmonizes the grant of benefits with the actualities of the labor market in order to further that legislation's remedial purpose, we are not persuaded to read the 1946 amendments, aimed at expanding the category of eligible annuity recipients, as reflecting a restrictive design.

## II.

Oddly, the Board, despite its insistence that it does not consider "actual employment opportunities" relevant, did survey the employment complexion of Duncan's geographic area, and reached the conclusion that "work which * * * [he] * * * can do is available in the economy and within his commuting area." We must therefore consider whether this finding is supported by substantial evidence on the whole record, for if it is, the decision should be affirmed. The evidentiary basis was a description of the industrial profile of Roanoke, Virginia, 18 miles from Duncan's Fincastle home, recited in two annual publications devoted to such analysis.

According to the 1964 Edition of N. W. Ayer & Son's Directory of Newspapers and Periodicals, Roanoke is a manufacturing center for such varied products as railroad equipment, fabricated steel, furniture, textiles, boats, paints and varnish, electronic tubes. And according to the 1963–64 Edition of the Occupational Outlook Handbook published by the United States Department of Labor, numerous job openings such as suggested for * * * [Duncan] * * * can be expected each year throughout the rest of the 1960's.

This assessment of employment prospects, however, falls far short of the minimum standards required in the Social Security context and which are appropriate here. Granting that this claimant is physically and mentally not disqualified from performing work of the type which the Board indicated, there is a total absence of any factual basis for a reasonable inference that employers would be willing to hire a person with his conceded impairments. As we have stressed in the past, expertise based exclusively upon abstract employment forecasts, absent any actual field investigation, is insufficient. See e. g., Gardner v. Earnest, 371 F.2d 606, (4th Cir. 1967); Ray v. Celebrezze, 340 F.2d 556 (4th Cir. 1965). Moreover, Duncan's only skill is as a boilermaker, a job to which he cannot return, and the Board itself excluded from its suggested job opportunities those requiring extensive training or unique skills. The very fact that a person like Duncan is thus relegated to the general manpower pool, consisting largely of able-bodied men, drastically reduces his chances of obtaining any regular em-

10. The Board points to the fact that the development of the railroad retirement system has been the product of joint efforts of railroad unions and carriers and that it reflects the compromises struck in the course of that association. See Report of the Joint Committee on Railroad Retirement Legislation, Part 1, S.Rep.No. 6, Part 1, 83rd Cong., 1st Sess. 2 (1953). The Board also notes that such collaboration continues to this day, nurtured by the inclusion on the Board of both a carrier and employee representative. 45 U.S.C.A. § 228j(a) (1954).

ployment that may exist. If he possessed a transferable skill, an employer might be willing to discount his medical history in the hope that he would become a productive worker. However, since he can compete for unskilled employment only, it is unrealistic, without additional supporting facts, to assume the real point in issue, whether employers would be willing to hire such a person, risking excessive absenteeism and the possibility of higher workman's compensation premiums. Cooke v. Celebrezze, 365 F.2d 425 (4th Cir. 1966). It is illusory to speak abstractly of a man's residual capacities as fitting him for new employment if, in reality, there is no demand for the services of people with his impairments. Such a person remains without employment not because of depressed economic conditions—a hazard not covered by this legislation; he remains unemployed because illness has made him unemployable. In essence, he is totally incapacitated. A rule which ignores this does not fulfill, but frustrates, the basic purpose of the law.

Thus, whether the Board disregarded employability in fact, thereby applying an incorrect legal standard, or considered it relevant but reached a conclusion unsupported by substantial evidence, its decision cannot be sustained. Yet had the Board been fully advertent to the prescribed standard, it might well have been able to develop on the record a basis for its conclusion that, with diligent effort, a person like Duncan could reasonably be expected to secure regular employment of the type it suggested. The case will therefore be remanded to afford the Board this opportunity, and reach a conclusion favorable or unfavorable to the applicant. On remand, the dual question is, as paraphrased by Judge Brown in Hayes v. Celebrezze, 311 F.2d 648, 654 (5th Cir. 1963), "[W]hat can appellant do? and * * * what employment opportunities are available to a man who can only do what the Claim-can do?" [11]

Order vacated and case remanded.