**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, et al., Petitioners,**

**Brotherhood of Locomotive Engineers, et al., Intervening Petitioners,**

**v.**

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**GRAND TRUNK WESTERN RAILROAD CO. and Detroit, Toledo and Ironton Railroad Co., Petitioners,**

**v.**

**UNITED STATES of America and Interstate Commerce Comm., Respondents,**

**CSX Corporation, et al., Intervening Respondents.**

**Nos. 80–2649, 82–1306.**

United States Court of Appeals, Seventh Circuit.

Jan. 19, 1983.

Basil Cole, Jr., Dechert, Price & Rhoads, Washington, D.C., Harold A. Ross, Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, for petitioners.

Lawrence Richmond, I.C.C., Washington, D.C., Roland W. Donnem, Chessie System Railroads Law Dept., Cleveland, Ohio, for respondents.

Before ESCHBACH and COFFEY, Circuit Judges, and DUMBAULD,* Senior District Judge.

* The Hon. Edward Dumbauld, United States Senior District Judge of the Western District of Pennsylvania, sitting by designation.

DUMBAULD, Senior District Judge.

On September 23, 1980, the Interstate Commerce Commission (I.C.C.), for reasons set forth in an opinion of over 130 pages,[1] approved under 49 U.S.C. § 11343 the acquisition of control by CSX Corporation (a new corporation created to carry out the instant merger) of a giant railroad system uniting the Chessie System, Inc. (controlling six rail carriers, including the C. & O. Railway Co., the B. & O. R.R. Co., and Western Maryland Ry. Co.) and Seaboard Coast Line Industries, Inc. (controlling ten rail carriers, including Seaboard Coast Line R.R. Co., Louisville & Nashville R.R. Co., and Clinchfield R.R. Co.). CSX will also acquire control of Richmond, Fredericksburg & Potomac R.R. The subsidiary rail carriers will remain as separate corporate entities.

In connection with its approval the Commission imposed certain conditions (commonly called the *New York Dock* conditions) for the protection of railroad labor; but refused to impose the set of conditions (commonly called the D.T. & I. conditions) which had in former years been routinely prescribed for protection of traffic routings for the benefit of competing carriers, but which recently have been repudiated by the Commission as interfering with the natural operation of competitive forces in a market economy.

In No. 80–2649 the labor appellants attack the Commission's failure to impose conditions more beneficial to labor than the *New York Dock* conditions; and in No. 82–1306 two railroads that will be competing with the CSX system for certain traffic attack the Commission's failure to impose the D.T. & I. conditions. For reasons hereinafter elaborated we affirm.

I

*The labor protective conditions*

█ In *U.S. v. Lowden*, 308 U.S. 225, 238, 60 S.Ct. 248, 255, 84 L.Ed. 208 (1939) the Supreme Court held that conditions for the protection of railroad employees affected by a consolidation of carriers could be imposed by the Commission under statutory language permitting approval of the consolidation if it "will promote the public interest."[2] In 1940 Congress made such protection mandatory. It was then provided that: "As a condition of its approval, . . . the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected."[3]

1. Reported at 363 I.C.C. 521. The decision embraces over 40 collateral and subsidiary proceedings (relating to trackage rights, abandonment, issuance of securities, and control of motor carrier) necessary to effectuate the efficient operation of the new system in the public interest.

A similar competing major unification of end-to-end lines connecting the Middle West and the South was approved by the Commission on March 19, 1982, in *Norfolk Southern Corporation-Control-Norfolk & Western Ry. Co. and Southern Ry. Co.*, 366 I.C.C. 171 (1982). There, too, the Commission imposed the *New York Dock* conditions and rejected the D.T. & I. conditions, although approval was given to agreements with Grand Trunk Western and Milwaukee roads.

2. In *I.C.C. v. Ry. Labor Assn.*, 315 U.S. 373, 376–78, 62 S.Ct. 717, 719–20, 86 L.Ed. 904 (1942), the Court held that such conditions could also be imposed under language authorizing imposition of "such . . . conditions as . . . the public convenience and necessity may require."

3. Act of September 18, 1940, 54 Stat. 898, 906. The legislation went on to establish a period of four years (or the period of prior employment) during which the merger "will not result in employees . . . being in a worse position with respect to their employment." That this did not require continuance of employment during the applicable period but merely a compensation allowance was held in *Maintenance Employees v. U.S.*, 366 U.S. 169, 173–75, 81 S.Ct. 913, 915–16, 6 L.Ed.2d 206 (1961). This conclusion was in accord with the terms of the Washington Job Protection Agreement, an industry-wide compact reached in May, 1936, between 219 railroads and 21 labor organizations. See 308 U.S. at 234, 60 S.Ct. at 253. In *Ry. Labor Executive's Assn. v. U.S.*, 339 U.S. 142, 153–55, 70 S.Ct. 530, 536, 94 L.Ed. 721 (1950), the Court held that the four year period was a minimum, not a maximum, and did not limit the broad scope of the first sentence requiring a "fair and equitable arrangement." This case, upon remand to the Commission, gave birth to the so-called "New Orleans conditions" which were frequently imposed in subsequent consolidation cases as the standard conditions for em-

The pertinent legislation was amended in 1976 to add a requirement that the conditions imposed must contain provisions which are "no less protective ... than those ... established pursuant to Section 405 of the Rail Passenger Service Act (45 U.S.C. 565)."[4]

This addition incorporates the experience resulting from the provisions of the Act of October 30, 1970, 84 Stat. 1327, 45 U.S.C. § 565, establishing Amtrak. The "fair and equitable arrangements" there mandated were to "include, without being limited to, such provisions as may be necessary for" five specified topics. It was further provided that provisions against worsening of the positions of employees "shall in no event provide benefits less than those established pursuant to section 5(2)(f) of the Interstate Commerce Act." 84 Stat. 1337.

In 1971 Secretary of Labor James D. Hodgson certified a set of conditions under the Amtrak statute known as the "Appendix C–1" or the "Amtrak" conditions. These were upheld as being in conformity with (or even in excess of) the requirements of the Amtrak statute and of section 5(2)(b) of the Interstate Commerce Act in *Congress of Ry. Unions v. Hodgson,* 326 F.Supp. 68, 76 (D.D.C.1971).

When the Interstate Commerce Act was codified by the Act of October 17, 1978, 92 Stat. 1337, the familiar Section 5(2)(f) became 49 U.S.C. § 11347 (92 Stat. 1439). It

was here ordained that an arrangement is required "at least as protective of the interests of employees ... as the terms imposed under this section before February 5, 1976, and the terms established under section 565 of title 45."

The apparent intention of the somewhat obscure language of 49 U.S.C. § 11347 was to require the continuance of protective provisions as elaborated in the Commission's practice pursuant to § 5(2)(f) prior to its amendment by the 4 R Act in 1976, plus the provisions developed under the Amtrak statute. That statute, it will be remembered, required inclusion of five specified items, namely: (1) preservation of benefits, including pensions, under collective bargaining agreements; (2) continuation of rights to collective bargaining; (3) protection against worsening of positions with respect to employment; (4) priority of reemployment for employees laid off; (5) paid training or retraining programs. Besides these statutory requirements of the Amtrak legislation, § 11347 probably also mandates the substance of the "Appendix C–1" conditions as certified in 1971 by Secretary Hodgson.[5]

The Commission, in attempting to formulate a standard set of conditions constituting "a fair arrangement suitable for imposition in the usual transactions involving rail carriers for which approval is sought,"[6] has

ployee protection. They were largely derived from the 1936 Washington Job Protection agreement. See *N.Y. Dock Ry. v. U.S.,* 609 F.2d 83, 86–88 (2nd Cir.1979).

**4.** Act of February 5, 1976 (commonly called the 4 R Act), 90 Stat. 31, 62.

**5.** This is so because § 11347 speaks of "terms *established under*" 45 U.S.C. § 565 rather than "terms required by" § 565. Similarly, the "*terms imposed* under this section [*i.e.,* § 5(2)(f)] before February 5, 1976" would refer to the practice of the Commission under § 5(2)(f) before enactment of the 4 R Act. *Ry. Labor Executives' Assn. v. U.S.,* 219 U.S.App. D.C. 23, 675 F.2d 1248, 1254 (1982).

**6.** Other than trackage rights and lease proceedings, where different conditions have been developed. *New York Dock Railway-Control-Brooklyn Eastern District Terminal,* 360 I.C.C.

60, 69, 71, 75 (1979). The adoption of standard conditions, routinely imposed, often results in incorporation of superfluous provisions having no application to the particular case under consideration. 360 I.C.C. at 69, 609 F.2d at 92. But this is harmless and may be an expedient administrative device to enable the Commission to dispose more expeditiously of its burdensome case load. In any event, the Commission indicated its willingness to consider modifications if required by the circumstances of particular cases. 360 I.C.C. at 71, 74. It is likewise a harmless bureaucratic quirk when the Commission for the sake of uniformity and consistency applied its usual abandonment and trackage rights conditions in the ancillary related proceedings of that kind involved in the case at bar. No harm to employees affected by such related proceedings can result, because such employees are also covered by the protective *New York Dock* conditions imposed in the principal proceeding. 363 I.C.C. at 591.

elaborated what are called the *"New York Dock* conditions," from the name of the case [7] where they were first formulated.[8] Those conditions were sustained in an able and thorough opinion by Judge Waterman in *New York Dock Ry. v. U.S.,* 609 F.2d 83, 92 (2d Cir.1979).

We agree with the Second Circuit's construction (609 F.2d at 94) of the obscure language of what is now § 11347. The provisions imposed under § 5(2)(f) before the 4 R Act mean the "New Orleans conditions" as clarified in a later proceeding.[9] The provisions established pursuant to 45 U.S.C.A. § 565 mean the Appendix C–1 conditions. The combination of these sources, as embodied in the *New York Dock* conditions, suffices to constitute compliance with the requirements of § 11347.

The arguments presented here contending that the *New York Dock* conditions do not suffice to satisfy the requirements of § 11347 are simply a repetition of contentions repeatedly made to and rejected by the Commission. They do not become more convincing by reiteration. We are satisfied that the conditions imposed by the Commission are adequate and valid.

## II

### *Traffic Protective Conditions*

■  Likewise the attack in the case at bar upon the Commission's refusal to impose the so-called D.T. & I. conditions is a threshing of old straw. For a long time the Commission has clearly enunciated its view that those conditions are undesirable because anticompetitive, and that it will not continue to impose them routinely.[10] Indeed, in *Rulemaking Concerning Traffic Protection Conditions in Railroad Procedures,* 366 I.C.C. 457 (1982),[11] it not only ruled that "no D.T. & I. conditions, or similar traffic protective conditions requiring rate equalization, be imposed in future consolidation proceedings," but also that D.T. & I. "Standard Conditions imposed in past consolidations and other similar conditions imposed prior to 1950 are hereby revoked, effective July 1, 1982." [12]

7.  See note 6, *supra.*

8.  360 I.C.C. at 84–90.

9.  *Southern Ry. Co.-Control-Central of Georgia Ry. Co.,* 331 I.C.C. 151, 154 (1967). It was in that decision that the Commission clarified the New Orleans Conditions by holding that sections 4 and 5 of the Washington Job Protection Agreement must be included. 360 I.C.C. at 68. In *New York Dock* the Commission held that inclusion of the C–1 conditions was also mandatory under § 11347. *Ibid.,* at 69. It could be argued that the language of § 11347 "grandfathers in" every item of protective conditions ever imposed by the Commission before February 5, 1976. This would require "total recall," akin to a computer retrieval, of every Section 5 case and incorporation of every type of provision discoverable by such research. This would be a perverse and impractical interpretation of § 11347. The Commission's interpretation, accepted by the Second Circuit, is a much more plausible explanation of what Congress intended.

10.  As it had done for thirty years previously. Ironically, the first occasion on which the Commission indicated any distaste for the D.T. & I. conditions was another proceeding involving control of the D.T. & I. The Norfolk & Western and Chessie sought control, each with a 50% interest. The Commission decided that control

by Grand Trunk Western would be more beneficial to the public interest. *N. & W. Ry. Co. v. U.S.,* 639 F.2d 1096, 1098 (4th Cir.1981). The court remanded the case to the Commission for further proceedings, since the first intimation of any change in policy had been given after the close of the testimony, in a notice suggesting discussion of the point at oral argument, to be held less than 30 days thereafter. The D.T. & I. and its parent Company GTW cannot plead surprise in the case at bar, as the new policy was first enunciated in the case where they were parties. *N. & W. R.R. Co.-Control-Detroit, Toledo & Ironton R.R. Co.,* 360 I.C.C. 498, 527 (1970). This decision on November 30, 1979, was handed down two months before the close of testimony in the CSX proceeding.

11.  The notice of proposed rulemaking dated July 7, 1980, was published in the Federal Register on July 10, 1980.

12.  366 I.C.C. at 134. The full text of the D.T. & I. conditions appears at *ibid.,* 135. The name is taken from the case in which the Commission first formulated this set of conditions, *Detroit, Toledo & Ironton R.R.-Control,* 275 I.C.C. 455, 492–93 (1950). Likewise "Commission approval of private agreements which ... provide protections similar to the D.T. & I. Conditions is withdrawn effective July 1, 1982." Such agreements were thus shorn of the immunity

In a thorough and well reasoned opinion the Commission outlined the change in economic conditions in the railroad industry in recent years, the inconsistency of the D.T. & I. conditions with "recent regulatory reform" and emphasized the Commission's powers under other provisions of the regulatory statute to deal effectively with the evils which the D.T. & I. conditions were designed to eliminate. Also noted was the economic policy that "Each carrier must be free to compete both in service and price to establish the price-service combinations that best meet shipper needs." [13]

The new policy with respect to traffic protective conditions was in accord with the views regarding conditions in general which had been set forth in a previously enunciated general policy statement concerning railroad unification transactions: *Railroad Consolidation Procedures, General Policy Statement,* 363 I.C.C. 784, 788–89, 792 (1981). It was there explained that "the Commission's concern is the preservation of essential services, not the survival of particular carriers" and hence that "the Commission will not normally impose conditions on a consolidation to *protect a carrier* unless essential services [14] are affected and the condition: (1) is shown to be related to the impact of the consolidation; (2) is designed to enable shippers to receive adequate service; (3) would not pose unreasonable operating or other problems for the consolidated carrier, and (4) would not frustrate the ability of the consolidated carrier to obtain the anticipated public benefit." [15]

The Commission's repudiation of D.T. & I. conditions has been consistently and uniformly manifested in its consolidation decisions subsequent to the announcement of the new policy in the case where GTW control of D.T. & I. was approved.[16]

Though the present fad of "deregulation" may be thought to go to extremes which sometimes may ultimately prove unwise,[17] it is clear that establishment of the "pro-competitive" policy disfavoring the D.T. & I. conditions falls squarely within the discretion of the Commission in exercising its regulatory expertise. To determine what degree of carrier competition is desirable in the public interest has long been recognized as a task for the Commission. This is true both in consolidation cases [18] and cases involving grant of operating authority to institute a new competitive service.[19]

The Commission's normal discretionary power to determine the degree of competition required to ensure adequate service to the public is intensified, under circumstances such as are involved in the case at bar, by the trend of recent Congressional policy with respect to "deregulation" of transportation. That policy seeks to encourage the operation of competition and the interaction of market forces, rather than the edicts of regulatory agencies, as the means of optimizing the allocation of economic resources in the public interest.

Accordingly, the Commission had authority to reject the D.T. & I. conditions and its

---

from the Antitrust laws derived from Commission approval. *Ibid.,* 133.

13. *Ibid.,* 115, 123.

14. Essential services are basically those the deprivation of which would result in inadequate service to the public. See 363 I.C.C. at 787. The essential services test as a component of "public interest" was approved in *M–K–T–R.R. Co. v. U.S.,* 632 F.2d 392, 400–403 (5th Cir.1980).

15. 363 I.C.C. at 792 (italics supplied). The essential services test does not apply to conditions necessary to protect the public. *Ibid.,* at 789.

16. These cases are reviewed at 366 I.C.C. 117–18. To these may now be added the CSX proceeding under review in the case at bar, and the *Norfolk Southern* case referred to in note 1 *supra.*

17. See *North American Van Lines v. I.C.C.,* 666 F.2d 1087, 1089–90 (7th Cir.1981).

18. *McLean Trucking Co. v. U.S.,* 321 U.S. 67, 87, 64 S.Ct. 370, 380, 88 L.Ed. 544 (1944).

19. *U.S. v. Detroit & Cleveland Navigation Co.,* 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945); *Lang Transp. Corp. v. U.S.,* 75 F.Supp. 915, 927, 930–32, 934 (S.D.Calif.1948); *Assure Comp. Transp. v. U.S.,* 635 F.2d 1301, 1305–1306 (7th Cir.1980).

determination, based upon careful evaluation of the factors involved, must be sustained.

PETITIONS FOR REVIEW DENIED.