William B. ANDREWS, Petitioner,

v.

RAILROAD RETIREMENT BOARD, Respondent.

No. 76–1916.

United States Court of Appeals, District of Columbia Circuit.

Argued June 9, 1977.

Decided June 26, 1978.

---

Joseph Forer, Washington, D. C., for petitioner.

John R. Sarnowski, Jr., Gen. Atty., Railroad Retirement Bd., Chicago, Ill., with whom Dale G. Zimmerman, Gen. Counsel, and Edward S. Hintzke, Asst. Gen. Counsel, Railroad Retirement Bd., Chicago, Ill., were on brief, for respondent.

Before ROBINSON and MacKINNON, Circuit Judges, and HOWARD T. MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

We are called upon to review a decision of the Railroad Retirement Board denying petitioner a disability annuity under the Railroad Retirement Act of 1937.[1] By the terms of the Act, petitioner is entitled to the annuity only if he has a "permanent physical or mental condition . . . such that [he is] unable to engage in any regular employment."[2]

An implementing regulation of the Board defines "permanent physical or mental condition" as an "impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than 12 months."[3] Another regulation provides:

An individual shall be deemed to be permanently disabled for work in any regular employment if he has a permanent physical or mental condition . . and he is because of such condition unable to perform regularly, in the usual and customary manner, the substantial and material duties of any regular and gainful employment which is substantial and not trifling, with any employer, whether or not subject to the act.[4]

The question we are to resolve is whether there is substantial evidence to support the administrative conclusion that petitioner is not permanently disabled within the contemplation of the Act and the Board's regu-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1970).

1. Act of June 24, 1937, ch. 382, pt. I, 50 Stat. 307, as amended 45 U.S.C. §§ 228a *et seq.* (1970). This legislation, under which the Board rendered its decision, has been superseded by the Railroad Retirement Act of 1974, Pub.L. No. 93–445, tit. I, 88 Stat. 1305, as amended, 45 U.S.C. §§ 231 *et seq.* (Supp. V 1975), hereinafter sometimes cited as codified. Since, however, appellant applied for his annuity and assertedly was eligible before the effective date of the 1974 Act, his claim is to be adjudicated by reference to the 1937 Act. Railroad Retirement Act of 1974, tit. II, § 201, 88 Stat. 1351. And while all annuities pursuant to the 1937 Act ceased on December 31, 1974, *id.*, benefits for annuitants thereunder are afforded by the 1974 Act. See *id.* §§ 202–210, 88 Stat. 1352, as amended by Pub.L. No. 94–92, tit. II, § 202(a),

89 Stat. 465 (1975), and Pub.L. No. 94–547, § 1, 90 Stat. 2523 (1976). We note that the statutory supersedure could not in any event affect the outcome in the instant case since § 2(a)(5) of the 1937 Act, 45 U.S.C. § 228b(a)5 (1970)— the provision in issue here, see note 2 *infra* —was reenacted in identical language as § 2(a)(1)(v) of the 1974 Act, 45 U.S.C. § 231a(a)(1)(v) (Supp. V 1975).

2. Railroad Retirement Act of 1937, § 2(a)5, 45 U.S.C. § 228b(a)5 (1970). This is the only provision under which appellant—a male, born August 31, 1918, with less than 30 years of service in the railroad industry—could have qualified for a disability annuity.

3. 20 C.F.R. § 208.10(a) (1977).

4. 20 C.F.R. § 208.17(a) (1977).

lations. Our examination of the record leads us to answer in the negative.

## I. THE ADMINISTRATIVE PROCEEDINGS

Petitioner was employed in the railroad industry between November 18, 1942 and January 9, 1959.[5] He then worked as a parcel post truck driver for the United States Postal Service from January 23, 1959, until April 13, 1973, when the Civil Service Commission approved a disability retirement.[6] On April 16, 1973, he applied for the disability annuity at stake in this litigation.[7] Since the issue is the adequacy of support for the administrative decision thereon, we recount the relevant evidence in some detail.

### A. *The Initial Decision*

With his application petitioner submitted two medical reports. One was by Dr. Saul Holtzman, who had treated petitioner in 1969 for a neck injury sustained in an automobile accident; the other was by Dr. Herbert M. Wechsler, who had conducted an examination in connection with petitioner's disability retirement from the Postal Service.[8] Dr. Holtzman stated that in 1969 petitioner "complained of headache, neck pain radiating in both arms, backache [and] nausea,"[9] and gave a diagnosis of

> [w]hiplash injury of the neck, traumatic in origin, severe [s]prain of the midthoracic and lumbosacral spine, traumatic in origin, moderately severe. Post-traumatic headaches. Osteoarthritis of the cervical and thoracic spine.[10]

Dr. Holtzman noted that petitioner had improved during the course of treatment but that "further time is necessary to determine whether the present symptoms will further subside or continue on a protracted or chronic basis due to the soft tissue injuries and the activation of the arthritis in the cervical spine."[11]

Dr. Wechsler's report of February 28, 1973, listed

> [Blood pressure is] 170/100. Tenderness and discomfort on motion of neck—Slight dyspena on exertion—Protuberant abdomen. Pains on bending.
>
> X-rays [of] cervical and thoracic spine [show] marked arthritic changes . .[12]

and set forth this diagnosis:

> Coronary artery disease
>
> Hypertension essential
>
> Diabetes mellitus
>
> Hyperthrophic arthritis cervical and thoracic spine
>
> Malrotation of the intestinal tract with recurrent pain
>
> Anxiety reaction[13]

Dr. Wechsler concluded that petitioner was unable to discharge the duties of the job he then had—delivering parcels—and that his disability, which began in May, 1969, was of indefinite duration.[14] In another statement dated April 24, 1973, Dr. Wechsler further advised that "[i]n 1962 [petitioner] had a nervous breakdown and was in Freedman [*sic*] Hospital, Washington, D.C., 30 days."[15]

On November 12, 1973, at the Board's request, petitioner was examined by Dr. Stanley R. Rothschild, an orthopedic surgeon. Dr. Rothschild reported that petitioner "complain[ed] of pain in the neck" but on physical examination had "a full painless range of motion of his neck, except

---

5. Record (R.) 20. He was in military service from December 4, 1943, to May 17, 1946.

6. R. 21, 36.

7. R. 20–24.

8. R. 32–35, 48–49.

9. R. 32.

10. R. 34.

11. R. 35.

12. R. 49.

13. R. 49.

14. R. 49.

15. R. 31.

on full forward flexion," [16] and that x-rays showed "a moderate amount of cervical spondylosis" and "a little spur formation between C–4–5." [17] His diagnosis was "[c]ervical spondylosis C–5–6 and C–4–5– probably resulting from an old trauma." [18]

The Bureau of Retirement Claims, the Board's initial adjudicating unit, notified petitioner on July 19, 1973, that the disability annuity was being denied on the ground that his physical condition was "not sufficiently severe to support [his] claim that [he was] permanently disabled for all regular employment." [19]

## B. *The Intermediate Appeal*

Petitioner appealed to the Board's appeals referee, the intermediate appellate stage [20] and transmitted the report of Dr. Everett J. Gordon,[21] another orthopedic surgeon who examined petitioner on May 13, 1970, and again on January 7, 1974. Dr. Gordon stated that petitioner complained of problems with "his head, neck and shoulders" and of "a constant headache"; [22] and that examination revealed that petitioner's blood pressure was 170/100 and that he was "heavy and overweight similar to his condition in 1970." [23] Dr. Gordon noted some limitation of neck movement and x-ray disclosure of a "[d]efinite increase in the osteoarthritic changes involving C–4, 5, 6 and 7 with increased calcification and spurring anteriorly and to a lesser extent posteriorly. A limited amount of flexion and extension

motion demonstrated." [24] His diagnosis was "advanced osteoarthritis of the cervical and dorsal spine limiting motion in his upper back. He also has hypertension." [25] And, "[c]ombined with his other medical problems of hypertensive cardiovascular disease, diabetes mellitus and anxiety reaction," Dr. Gordon said, "I believe he can be considered totally disabled for work." [26] A Board-arranged examination by Dr. Edward W. Youngblood on March 8, 1974, yielded a diagnosis of "1) Osteoarthritic and radicular chest pain Esophagitis 2) Exogenous Obesity and liable Hypertension 3) Adult diabetes (by history)." [27]

At a hearing on May 16, 1974, before the appeals referee, petitioner and Dr. Gordon were the only witnesses.[28] Petitioner testified that daily he experienced "severe chest pains" [29] and pain "in the back, [his] arms and [his] hands"; [30] "headaches . . . on a 24 hour basis"; [31] and "arthritis, stiffness of the neck [and] diabetes." [32] He avowed that he could no longer drive a car because of chest pains and that all he could do was "sit on the porch, read papers, magazines, books and that's about it." [33] He also adverted to anxiety problems, which he was unable to describe.[34]

Dr. Gordon testified that x-rays of petitioner's neck "demonstrated . . . limited . . . motion consistent with the arthritis" [35] and that 1974 x-rays, in comparison with 1970 x-rays, "showed a defi-

---

16. R. 53.

17. R. 53–54.

18. R. 54.

19. Letter of December 11, 1973, from Mr. D. M. Smith, Director of Retirement Claims, to Mr. William Andrews, Petitioner's Appendix (App.) 21.

20. R. 58.

21. R. 60.

22. R. 60.

23. R. 60.

24. R. 60.

25. R. 60.

26. R. 60.

27. R. 63.

28. App. 22–41.

29. App. 34.

30. App. 34–35.

31. App. 35.

32. App. 35.

33. App. 36.

34. App. 39.

35. App. 25.

nite increase in the arthritis, showing that it was becoming progressively worse." [36] He said that while the hypertension and arthritis could be controlled to some extent by medication, that would cause him to be "drowsy and lethargic and his reactions, reflexes [would] be diminished." [37]

In response to questions concerning petitioner's ability to work on a regular basis, Dr. Gordon stated that in consequence of his "arthritis, high blood pressure, [and] anxiety reaction" and because "he gets nervous when he gets these difficulties, the blood pressure goes up, he gets very nervous", he "[could not] be classified as a regular employee." [38] Dr. Gordon explained that while petitioner might occasionally be able to work at a job involving sitting part of the day and moving around part of the day, "I don't think he would be able to do it on a fixed basis. For example, if he was supposed to work Monday, Wednesday and Friday, or half days, I think he would miss half of those times, maybe more." [39] At most, said Dr. Gordon, appellant "might occasionally [be able to] do some sporadic type of work." [40]

On September 25, 1974, the appeals referee sustained the ruling of the Bureau of Retirement Claims that petitioner was ineligible for a disability annuity.[41] After summarizing the medical evidence, the referee concluded that petitioner's condition was "not such as to be disabling for work in any regular employment within the meaning of the . . . Act." [42]

C. *The Final Appeal*

Petitioner then appealed to the Board,[43] the last step afforded by the administrative scheme. The Board retained a vocational consultant, Dr. Reubin S. Horlick, to review the file on petitioner.[44] Dr. Horlick submitted a statement dated April 25, 1975 in which he observed that the

[r]eports from medical examiners indicate a history of asteoarthritis [*sic*], diabetes, headaches, heart condition, hypertension and cardiovascular disease but, according to the reports, the residual loss is not sufficiently disabling to permanently prevent [petitioner] from engaging in regular, substantial employment, although he claims inability to walk or stand for long periods of time.[45]

Dr. Horlick believed petitioner, "taking into consideration his educational attainments, his training and experience," [46] could handle a number of jobs involving activities not requiring physical strength.[47] Dr. Horlick noted, however, that "in the light of present economic conditions and [petitioner's] inability to qualify for federal or local civil service positions, the availability of many jobs may be precluded and should be considered in any evaluation regarding regularity or permanence of employment." [48]

The Board, at petitioner's request, held a hearing on November 17, 1975, at which Dr. Horlick was cross-examined by petitioner's counsel. Because six months had elapsed since rendition of his report, Dr. Horlick was unable to recall specifically the medical reports he had utilized in deriving his opinion that petitioner's "residual loss is not sufficiently disabling to permanently prevent him from engaging in regular substan-

---

36. App. 25.

37. App. 27.

38. App. 30.

39. App. 31.

40. R. 76.

41. *William B. Andrews*, R.R.B. No. A–579–10–9471 (Appeals Referee Dec. Sept. 24, 1974), R. 95.

42. *Id.* at 9, R. 103.

43. R. 107.

44. R. 113.

45. App. 42.

46. App. 43.

47. App. 43.

48. App. 44.

tial employment."[49] Moreover, when the opinion was challenged, Dr. Horlick said:

> All that I can tell you is that in review of my records that I had available to me, the indications were to me, that he was capable of performing regular work on a substantial basis. There is evidence to indicate, from Dr. Gordon and some of the other medical reports that he is not on a permanent basis. My only point is that I was asked to determine on the basis of what I presumed to be adequate capabilities, to perform a variety of jobs. Now if it is indicated that there is sufficient evidence to indicate that [petitioner] is not capable of performing on a permanent substantial basis (the medical reports substantiate that), I am willing to state that on the basis of the medical reports, that he is not capable of performing full time regular employment, if the medical reports so indicate.[50]

As petitioner's counsel pointed out, however, Dr. Gordon had reported exactly the opposite finding of what Dr. Horlick attributed to him.[51] When asked to cite any other support for his assumption that it had been medically established that petitioner could do regular work not involving heavy lifting, Dr. Horlick could refer only to a "medical report" by a "Dr. Smith,"[52] which

turned out to be instead the initial decision by "D. M. Smith," an employee of the Board.[53] Thus, ultimately, Dr. Horlick admitted that

> at the time I . . . thought it was justified in the way I expressed it. Upon review and upon the evidence now being presented I am willing to state that he is permanently disabled as indicated by the record and that he is not qualified to perform the jobs that I have indicated.[54]

"I am in agreement with you," Dr. Horlick later repeated, "that he cannot perform jobs that require a regular, full time 40 hour a week job."[55]

On September 16, 1976, the Board issued its decision affirming the appeals referee.[56] It concluded that "none of the diseases diagnosed for [petitioner] are of such severity, either considered alone or in combination, as to render him unable to work in any regular employment."[57] Petitioner then sought review in this court.[58]

## II. SUFFICIENCY OF THE EVIDENCE

Our function is rather narrow. We are statutorily required to accept the Board's findings of fact when supported by substantial evidence on the record considered as a whole.[59] When, however, Board findings

---

49. App. 55–73. It is clear that this was not an independent conclusion resulting from Dr. Horlick's own expertise. He later testified that he had relied on what he thought the medical reports had established, for "I'm not a medical doctor." App. 51; see App. 60.

50. App. 71.

51. App. 71–72.

52. App. 68–69.

53. App. 69–70, 73.

54. App. 76.

55. App. 81.

56. *William B. Andrews*, R.R.B. No. A–579–10–9471 (Railroad Retirement Bd. Sept. 16, 1976). App. 2.

57. *Id.* at 18, App. 19.

58. Pursuant to 45 U.S.C. § 231g (Supp. V 1975), incorporating by reference 45 U.S.C. § 355(f) (Supp. V 1975).

59. 45 U.S.C. § 355(f) (Supp. V 1975) in pertinent part specifies:

> The findings of the Board as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive.

This provision, formerly amended § 5(f) of the Railroad Retirement Act of 1937, 45 U.S.C. § 355(f) (1970), "has been interpreted uniformly as meaning simply that '. . . the Board's decision should not be disturbed if supported by substantial evidence in the record and if not based on an error of law.'" *Bertamini v. Railroad Retirement Bd.*, 142 U.S.App. D.C. 250, 252, 440 F.2d 278, 280 (1971), quoting *Schafer v. Railroad Retirement Bd.*, 217 F.2d 874, 875 (7th Cir. 1954); see *Gloss v. Railroad Retirement Bd.*, 114 U.S.App.D.C. 177, 178, 313 F.2d 568, 569 (1962); *Aldridge v. Railroad Retirement Bd.*, 285 F.2d 759, 760 (5th Cir. 1961); *Ogle v. Railroad Retirement Bd.*, 238 F.2d 233 (6th Cir. 1956).

The Supreme Court has explained the substantial-evidence test as demanding

> such relevant evidence as a reasonable mind might accept as adequate to support a con-

lack that degree of evidentiary underpinning, courts cannot permit them to stand.[60] Testing the Board's decision by these straightforward canons, we are unable to uphold it.

The pervading difficulty is that although the Board quoted extensively from the medical reports and meticulously summarized testimony adduced at the hearings,[61] its findings deviate sharply from the evidence, even as described in its own opinion. Perhaps nowhere is this more conspicuous than in the Board's critical declaration that it could not

> accept as conclusive the medical impression of Dr. Gordon that [petitioner] is totally and permanently disabled for work because his view is contrary to the weight of the evidence and was based on a combination of [petitioner's] claimed medical problems (diabetes, heart trouble, hypertension and anxiety reaction) of which Dr. Gordon professed no personal information and for which there is no other satisfactory evidence in this record.[62]

In the first place, the Board's statement that there was no acceptable evidence pertaining to the four medical problems listed

is belied by the record. Dr. Youngblood, a Board consultant, predicated a diagnosis of hypertension squarely upon his examination of petitioner.[63] Dr. Wechsler's broader-ranging diagnosis of anxiety reaction, diabetes and hypertensive cardiovascular disease were identically based on petitioner's "history *and* [p]hysical examination." [64] The record thus incorporates expert opinion founded upon expert observation that petitioner suffered from each of the enumerated maladies. The Board was likewise incorrect in its assertion that Dr. Gordon had no personal knowledge of petitioner's hypertension. The record discloses uncontradictedly that Dr. Gordon had taken blood pressure readings,[65] and he testified unequivocally that petitioner's pressure was elevated.[66] While we defer to an administrative agency's resolution of conflicting evidence, we must not free it to simply ignore undisputed evidence.[67]

Were the Board's misstatements of fact not enough, it also erred grievously in its characterization of Dr. Gordon's opinion that petitioner is totally and permanently disabled as "contrary to the weight of the evidence." [68] Analysis of the record reveals

---

clusion. *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229 [, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938)]. "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Labor Board v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 [, 59 S.Ct. 501, 505, 83 L.Ed. 660, 665 (1939)]. This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131, 140–141 (1966) (footnote omitted).

**60.** See cases cited note 59 *supra*.

**61.** App. 2–17.

**62.** App. 19.

**63.** R. 62–63; see text *supra* at note 27. This is evidenced by the blood pressure readings included in his report. It is also to be noted that he diagnosed diabetes by history only, thereby

distinguishing it from his diagnoses of hypertension and osteoarthritis.

**64.** R. 31 (emphasis supplied); see text *supra* at notes 12–15. Dr. Wechsler's initial report included a diagnosis of anxiety reaction. Text *supra* at note 13. The Board's summary of his report omitted this diagnosis, App. 5, which may be explained by the difficulty of reading the words in the handwritten report. See R. 49. However, Dr. Wechsler also submitted to the Board a statement listing a diagnosis of anxiety reaction. R. 31. That statement is not referred to in the Board's decision.

**65.** See text *supra* at note 23.

**66.** See text *supra* at note 25.

**67.** This evidence consequently rebuffs any reasonable assertion that no weighing of evidence was necessary because petitioner failed to meet his burden of proof. While the burden of proof was initially on petitioner, its requirements may not be manipulated to avoid judicial application of the substantial evidence test.

**68.** Text *supra* at note 62.

plainly enough the consistency of that opinion with the whole of the evidence.[69] We are mindful that Dr. Horlick—the vocational consultant—at one time entertained a view at odds with Dr. Gordon.[70] We are satisfied, however, that the Board could not properly have accepted Dr. Horlick's evidence as any sort of contradiction of Dr. Gordon.

To begin with, the Board's summary of Dr. Horlick's testimony bears only a slight resemblance to what he actually said. Particularly startling is the Board's failure to mention that ultimately Dr. Horlick completely changed his opinion on petitioner's physical capabilities.[71] Instead, after referring to difficulties Dr. Horlick had in remembering after six months the medical reports on which he had relied,[72] the Board stated that

> [a]lthough the vocational consultant . . . acknowledged that Dr. Gordon had said [petitioner] could not perform regular substantial work, Dr. Horlick insisted throughout the cross-examination that his review of the record revealed medical evidence showing [petitioner's] residual loss is not sufficiently disabling to permanently prevent his regular employment.[73]

To be sure, at points in his testimony Dr. Horlick maintained that when he wrote his report he thought that the medical evidence established his original belief that petitioner could function adequately in several job categories.[74] But the Board's assertion that Dr. Horlick adhered to that notion through-

out his testimony is totally untenable. As we stated earlier,[75] Dr. Horlick's final opinion was that there was no regular job that petitioner could hold:

> [A]t the time I . . . thought it was justified in the way I expressed it. Upon review and upon the evidence now being presented I am willing to state that he is permanently disabled as indicated by the record and that he is not qualified to perform the jobs that I have indicated[76]

or, indeed, any "regular, full time 40 hour a week job."[77] In light of these and similar statements at the Board hearing,[78] we are at a loss to comprehend how the Board could have understood that Dr. Horlick persisted in his prehearing view, and that any wavering on his part was merely the result of his inability to put his finger on the medical reports upon which he had premised his earlier stand.[79]

This is the more unsettling because it would have been impossible for Dr. Horlick to have found in the record any medical report or testimony indicating that petitioner was able to engage in regular employment. All he could have come by were some reports expressing no opinion on the full extent of petitioner's disability.[80] Earlier, in evaluating the various medical reports, the Board had said that with the exception of Dr. Gordon, none of the physicians who examined petitioner found any condition sufficiently severe to be disabling within the meaning of the statute.[81] The

69. See Part I *supra.*

70. See text *supra* at note 45.

71. See text *supra* at note 54.

72. App. 17–19.

73. App. 17.

74. See text *supra* at note 50.

75. See text *supra* at notes 51–54.

76. App. 76.

77. App. 81.

78. See text *supra* at notes 50–53.

79. App. 17–19.

80. See Parts IA–B *supra.*

81. See text *supra* at note 62. Petitioner contends that once he has shown that he is unable to perform on his regular job, the Board must prove not only that he is capable of handling other jobs but also that he can reasonably be expected to obtain such jobs in light of his physical condition and experience. See *Dun-*

truth of the matter is that it is impossible to know what most of them felt since only Drs. Gordon and Wechsler offered opinions on this ultimate issue. Dr. Wechsler deemed petitioner physically unfit for his job as a parcel post truck driver, and intimated no view whatever as to his ability to handle less strenuous assignments.[82] Dr. Gordon, speaking directly and emphatically to the point "considered [petitioner] totally disabled for work."[83] No less troubling is the Board's further claim that "the medical reports of Drs. Youngblood and Rothschild . . . even though they did not employ such definitive terms, explicitly show that [petitioner] was not totally and permanently disabled."[84] The Board did not attempt to explain how that result could be inferred from those reports, and we discern but one word—appearing in but one of the reports—that conceivably could be read as a suggestion that any of petitioner's several medical problems was not of a sufficiently serious nature. Dr. Rothschild used the term "moderate" in describing the extent of cervical spondylosis as it appeared through an x-ray,[85] although he used no such modifier in listing cervical spondylosis in his diagnosis.[86] We think the mere circumstance that this condition was once labeled "moderate" does not rationally lead to the conclusion that it, particularly in combination with others, does not disable one who suffers from it.[87] Put another way, Dr. Roths-

child's one-time characterization of petitioner's cervical spondylosis as only "moderate" is hardly the substantial evidence needed to overcome the contrary weight of the evidence and support an administrative finding that petitioner's total medical predicament is not debilitating enough to generate statutory disability.

## III. CONCLUSION

Close scrutiny of the evidence of record points inexorably to error in the Board's holding that petitioner is not totally and permanently disabled within the meaning of the Railroad Retirement Act of 1937. The unimpeached findings of several physicians, taken together, are that petitioner suffers from osteoarthritis, hypertension and anxiety reaction; no physician even hinted that he does not. Two physicians reported or testified that petitioner is severely disabled by these conditions; none found or intimated that he is not. The Board's vocational consultant, who originally deemed petitioner capable of performing adequately in several job categories, changed his mind completely and testified unqualifiedly that petitioner is unable to hold down any of the jobs he had listed or any regular employment. Nor is there any evidence indicating that petitioner is able "to perform regularly, in the usual and

---

can v. Railroad Retirement Bd., 375 F.2d 915, 920–921 (4th Cir. 1967). We do not reach that question. Since there is no substantial evidence to support the Board's conclusion that petitioner could engage in regular employment, no useful purpose would be served by inquiring whether he could obtain a regular job if he were able to work at it. See Bertamini v. Railroad Retirement Bd., supra note 59, 142 U.S.App.D.C. at 253 n.4, 440 F.2d at 281 n.4.

82. See text supra at notes 12–15.

83. See text supra at note 26.

84. App. 18.

85. See text supra at note 17.

86. See text supra at note 18.

87. See Ber v. Celebrezze, 332 F.2d 293, 299 (2d Cir. 1964); Mode v. Celebrezze, 359 F.2d 135, 136 (4th Cir. 1966); Underwood v. Ribicoff, 298 F.2d 850, 854 (4th Cir. 1962).

[O]nce a clinical symptom is shown to exist, its disabling effect must be considered in light of all the circumstances, including the particular claimant's subjective reactions and general background.

Mode v. Celebrezze, supra, 359 F.2d at 136 (footnote omitted).

While these cases were all decided under the Social Security Act, 42 U.S.C. § 423 (1970), cases under that Act are instructive since the standards for determining when a person is permanently disabled are similar.

customary manner, the substantial and material duties of any regular and gainful employment which is substantial and not trifling. . . ."[88] In this milieu, the Board's decision is devoid of the support the Act demands.[89]

Five years have elapsed since petitioner advanced his claim to a disability annuity, as have many months since the record was fully developed on the state of petitioner's health. Our careful review of that record has unearthed no body of evidence upon which the Board might now proceed legitimately to the finding we hold infirm today. We see, then, no reason to call upon the Board for a new determination.[90] Accordingly, we reverse the Board's decision and remand the case to the Board with the instruction that petitioner be awarded forthwith the disability annuity for which he applied.

*So ordered.*

---

**88.** Text *supra* at note 4. Compare 45 U.S.C. § 231a(a)(1)(v) (Supp. V 1975) with 42 U.S.C. § 423(d)(1)(a) (1970).

**89.** See notes 2 & 59 *supra* and accompanying text.

**90.** See *Swinton v. J. Frank Kelly, Inc.,* 180 U.S.App.D.C. 216, 226, 554 F.2d 1075, 1085,

*cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976); *Ber v. Celebrezze, supra* note 87, 332 F.2d at 301; *Mode v. Celebrezze, supra* note 87, 359 F.2d at 137; *Cyrus v. Celebrezze,* 341 F.2d 192, 197 (4th Cir. 1964); *De Paepe v. Richardson,* 464 F.2d 92, 99 (5th Cir. 1972).