**Stuart M. REED, Petitioner,**

v.

**RAILROAD RETIREMENT BOARD, Respondent.**

No. 97–1610.

United States Court of Appeals, District of Columbia Circuit.

Argued May 12, 1998.

Decided June 9, 1998.

Jacqueline R. Scott argued the cause and filed the briefs for petitioner.

Arthur A. Arfa, General Attorney, Railroad Retirement Board, argued the cause for respondent, with whom Catherine C. Cook, General Counsel, and Steven A. Bartholow, Deputy General Counsel, were on the brief.

Before: WALD, TATEL and GARLAND, Circuit Judges.

PER CURIAM:

Former Conrail President Stuart M. Reed petitions for review of a decision by the Railroad Retirement Board declaring him ineligible for railroad retirement benefits. We deny the petition because substantial evidence supports the Board's determination that Reed terminated his employment with Conrail more than a year short of the ten years necessary to qualify for such benefits.

Under section 2(a)(1) of the Railroad Retirement Act, an individual must have "ten years of service" to be eligible for retirement benefits. 45 U.S.C. § 231a(a)(1). Section 3(i)(4) of the Act provides that "an individual shall not be deemed ... to have rendered service for compensation in any month in which such individual was [not] in an employment relation to one or more [covered] employers...." 45 U.S.C. § 231b(i)(4). And section 204.5 of the Board's regulations provides that "an employment relation ... ceases after an individual has resigned or relinquished his or her rights to return to the service of [the] employer." 20 C.F.R § 204.5.

On December 30, 1987, Reed entered into an agreement under which he resigned effective the next day as President, Chief Operating Officer, and Director of Conrail. Pursuant to the agreement, Conrail agreed to pay Reed $1.2 million in exchange for a general release of Reed's claims against the railroad, and also agreed that Reed would participate in Conrail's Management Incentive Compensation Plan "for the calendar year 1987, ... with the amount and timing of any bonus to be received by Mr. Reed thereunder to be determined in accordance with the terms of that Plan." Conrail paid Reed $1,288,763 in 1988 and $75,115 in 1989. The payments were administered through Conrail's payroll

system, and Conrail sent Reed IRS Form W–2 wage and tax statements for those years.

The Board held that the December 1987 agreement terminated Reed's employment relationship with Conrail, and that the subsequent payments were the separation allowances contemplated by the agreement. Reed contends that although he resigned as President, Chief Operating Officer, and Director, he remained an "employee"; that the payments were for "holding himself available" to advise Conrail in 1988 and 1989; and that those years should therefore be counted toward the ten-year requirement.

This is Mr. Reed's second trip to this court. We granted his previous petition for review and remanded to the Board to explain how its conclusion that Reed had terminated his employment in December 1987 was consistent with the fact that the payments he received over the next two years were distributed through Conrail's payroll system. See Reed v. Railroad Retirement Bd., 107 f.3d 923 (D.C.Cir. 1997). Remand was required because the Board had failed to address the Railroad Retirement Act's presumption that a "payment made by an employer to an individual through the employer's payroll shall be presumed, *in the absence of evidence to the contrary*, to be compensation for service rendered by such individual as an employee of the employer in the period with respect to which the payment is made," 45 U.S.C. § 231(h)(1) (emphasis added). We also ordered the Board to explain how Reed's case differed from that of *Illinois Central Gulf*, Railroad Retirement Board, Legal Op. 89–80 (June 22, 1989), in which the Board credited as employment service the period during which individuals received "dismissal" payments.

On remand, the Board explained that the statutory presumption had been rebutted by "evidence to the contrary"—namely, the 1987 agreement under which, according to the Board's interpretation, Reed resigned before he received the payments in question. *Illinois Central Gulf* was different, the Board

said, because in that case the employees agreed to resign at the end of the period during which their dismissal payments were to be made. We find these explanations adequate to satisfy the requirement of reasoned decisionmaking.

■ We review decisions of the Board for substantial evidence in the record and for errors of law. See Andrews v. Railroad Retirement Bd., 595 F.2d 676, 681 & n. 59 (D.C.Cir.1978); 45 U.S.C. § 231g; 45 U.S.C. § 355(f). Moreover, we apply a *Chevron*[1] analysis when reviewing an agency's interpretation of a contract. See National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1569 (D.C.Cir.1987). Thus, if the intent of the parties is clearly expressed in the document, that intent must prevail. See id. at 1572. If the contractual language is ambiguous, however, we will defer to an agency's reasonable interpretation. See id.

■ Under these deferential standards, we uphold the Board's conclusion that Reed had no employment relationship with Conrail after December 1987. The agreement stated that Reed was "an employee, officer and director of Conrail" and that he wished "to resign all such positions with Conrail." The specific resignation clause provided that "[e]ffective at the close of business on December 31, 1987," Reed "resigns from employment as President and Chief Operating Officer of Conrail and as a member of Conrail's Board of Directors." Although the resignation clause did not repeat that Reed also was resigning as an "employee," there is nothing to suggest that Reed's prior status as an "employee" was based on anything other than his positions as officer and director. To the contrary, a subsequent paragraph of the agreement noted that Reed "was asked to and agreed to resign *from his positions* with Conrail" (emphasis added). Nor is there anything in the agreement to suggest that Reed would receive any new position, "hold himself available" to advise Conrail, or otherwise perform any future services. The absence of such indications is

---

**1.** *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

particularly significant given the agreement's integration clause, which stated that "[t]his agreement and Exhibit A attached hereto [the general release] contain the entire agreement between the parties hereto and supersede any and all prior or contemporaneous agreements between the parties."

Other sections of the agreement to which Reed points do not counsel a different interpretation. Although the agreement did provide that Reed's life insurance and medical benefits would be made available to him "*as if* his employment *were* continuous from February 10, 1979 through July 31, 1990" (emphasis added), the subjunctive mood of the emphasized language indicates the signers' understanding that Reed's employment would not actually be continuous for that period. And while the agreement also included a "noncompetition" clause barring Reed from employment with one of Conrail's competitors through July 1990, that hardly evidences an understanding that Reed would be employed with Conrail during that time. Employers commonly use such clauses in an effort to restrict their employees' post-employment activities. *See, e.g., Smith, Bucklin & Assocs., Inc. v. Sonntag,* 83 F.3d 476, 478 (D.C.Cir.1996); *Group Ass'n Plans, Inc. v. Colquhoun,* 466 F.2d 469, 470 (D.C.Cir. 1972). In sum, even were we to view the agreement's language as ambiguous, we would uphold the agency's interpretation not only as a reasonable reading, but as the most reasonable reading of the contract.

The extrinsic evidence of subsequent conduct offered by Reed is not at variance with this reasonable interpretation of the contract's language. The fact that Conrail reported its 1988 and 1989 payments to Reed on W–2 forms for those years is not necessarily inconsistent with the view that he re-

signed on December 31, 1987. Indeed, the best explanation for the payments is that they constituted the payout of the $1.2 million, which the agreement made clear was "in exchange for the General Release" entered into in December 1987, plus the promised bonus for work performed during 1987. Conrail may well have believed that since those payments were attributable to a year in which Reed was an employee, they should be reported on W–2 forms in the year in which they were paid, even though by that time Reed was no longer employed.[2]

While counsel for Reed does not dispute that the amount over $1.2 million represented bonus payments, she contends that it represented bonuses for work Reed performed in 1988 and 1989. Yet, there is no mention in the agreement of any contemplated bonuses other than those attributable to "calendar year 1987," and no mention of other amounts to be paid Reed for any other services. There also are no time or attendance records, or any other documentation to support a claim that Reed performed work in 1988 or 1989, or that he was paid for work performed in those years. Even counsel's own submission to the Board referred to the payments merely as bonuses "which ... could not be paid until 1989"—without indicating the work year with which they were associated. Counsel's "could not be paid until 1989" characterization is consistent with the agreement's declaration that "the amount and timing" of the 1987 bonus were left for future determination.

Finally, we reject Reed's contention that the Board abused its discretion in reopening his case after a favorable decision by a hearings officer. The applicable Board Order permits the Board to reopen a decision without time limit when the underlying certifica-

**2.** *See* 26 C.F.R. § 31.3401(a)-(1)(a)(5) (IRS regulation providing that "[r]emuneration for services ... constitutes wages even though at the time paid the relationship of employer and employee no longer exists"). Moreover, although Reed correctly points out that the current Instructions for Form W–2 indicate that it is to be used by employers "to report their employees' wages," 1997 Instructions for Form W–2, at 4, Conrail may have believed that both the release payment and the bonus payments constituted wages for tax reporting purposes. *See* 26 C.F.R.

§ 31.3401 (a)-(1)(b)(4) ("Any payments made by an employer to an employee on account of dismissal, that is, involuntary separation from the service of the employer, constitute wages...."); *id.* § 31.3401(a)-(1)(a)(2) ("bonuses ... are wages within the meaning of the statute"). In concluding that the reporting of these items on W–2 forms is not necessarily inconsistent with the Board's interpretation of the contract, we need not determine whether Conrail's treatment was correct under the Internal Revenue Code or IRS regulations.

tion of eligibility for benefits is erroneous. *See* Railroad Retirement Board Order 75–5, § 17 (Apr. 12, 1988); *see also* 20 C.F.R. § 260.9(g) ("The Board may, on its own motion, review ... any decision issued by a subordinate official or employee...."). Reed's argument that the Board had discretion not to reopen his case fails to establish that the Board abused its discretion by taking the other path.

The petition for review is denied.